Clyde Nielsen and Inger Nielsen Keesler, as Beneficiaries of the Will of Effie M. Gatrel, Deceased, Petitioners-Appellants, v. Germaine A. Duyvejonck, as Executor of the Will of James Frederick Gatrel, Deceased, Respondent-Appellee.

Gen. No. 67–63.

Third District.

April 25, 1968.

Joseph R. Rosborough, of Moline, for appellants.

Myron Murphy, of Rock Island, for appellee.

CULBERTSON, J.

This case presents as its principal issue the construction of the will of Effie M. Gatrel, deceased, and arises from a controversy between remaindermen and the executor of the estate of the life tenant.

The decedent, Effie M. Gatrel, died on March 21, 1944. By her last will, dated March 26, 1943, she first directed the payment of her funeral expenses and just debts, and then disposed of the balance of her estate as follows:

225

"All the rest, residue and remainder of my Estate, real, personal or mixed, and wheresoever situate, I give, devise and bequeath to my beloved husband, James F. Gatrel, to have, use and enjoy the same during the term of his natural life, with full power and authority to sell or dispose of any part thereof, whenever in his sound discretion he shall deem it necessary for his comfort and support.

"Upon the death of my said husband, if there shall be left any of my said Estate, I give, devise and bequeath . . . (in shares to designated remaindermen)."

It may be interjected at this point that the parties are in accord that the power to convey the fee annexed to the life estate did not enlarge the devise of the life estate into a fee. See: Rock Island Bank & Trust Co. v. Rhoads, 353 Ill 131, 140, 187 NE 139; Barton v. Barton, 283 Ill 338, 340, 119 NE 320.

Effie's will was admitted to probate on June 22, 1944, and the husband-life tenant qualified as executor. He was then just short of 60 years of age and was an employee of the Burlington Railroad. An inventory was filed, which fixed no values, and reflected that Effie's personal property consisted only of a Hudson automobile, while her real property was comprised of two city lots in Rock Island. Both such lots were income properties, one being improved with a duplex residence and the other being partly occupied by a gasoline station. The station had been leased to Skelly Oil Company on September 2, 1939, for a ten-year period at a rental of $100. In addition, at the time of Effie's death, the lot upon which the station was located was encumbered by a mortgage payable in monthly installments of $100. Just how, or where, Gatrel obtained funds to pay funeral expenses, debts (if any), and costs of administration in his wife's estate does not appear in the record before us. In any

event, on November 24, 1944, five months after the admission of the will to probate, Gatrel sold the duplex property for $8,500. The following day he paid the principal balance of $5,231.64 on the gas station mortgage.

Gatrel survived his wife by some 20 years and in that period the following events occurred: (1) On March 1, 1945, he reached age 60 and retired from the railroad. He received a monthly pension of $48 until 1956 or 1957, and $80.90 per month thereafter; he did not receive Social Security benefits. So far as the record shows, he was never again gainfully employed. (2) In March, 1949, he leased the gas station to Skelly for a five-year period at a rental of $175 per month, being required by the lease to pay taxes and to maintain the station and its equipment in a tenantable condition, except for painting. (3) The same year, on November 24, 1949, he sold the east 50 feet of the filling station lot for $4,000, his deed reciting: "This conveyance is made pursuant to the provisions of the second paragraph of the last will of Effie M. Gatrel, deceased, and the Grantor hereby certifies that he deems this conveyance necessary for his comfort and support." (4) On September 26, 1951, Gatrel entered into a contract to sell the balance of the station property to parties named Showalter for the sum of $12,000, payable $2,000 down and then at a rate of $125 or more monthly. Under the contract, Gatrel agreed to pay general taxes and to make ordinary repairs. (5) Two days later, on September 28, 1951, Gatrel mortgaged the filling station property for $10,000, an indebtedness he paid off at the rate of $125 a month, with the final payment being made in May, 1959. In their brief, petitioners suggest that Gatrel used the money realized from the mortgage to purchase some real property in Henry County; however, we find nothing in this record which permits us to conclude or infer that such was the case. Indeed, there is no proof as to when or how he acquired such property.

(6) On December 31, 1958, Gatrel and the Showalters entered into a new lease with Skelly, this time at a monthly rental of $325, wherein the lessors were obligated to pay taxes and to maintain the premises and equipment. (7) Under date of February 15, 1959, he entered into a contract with parties named Herdt to sell the Henry County property, previously mentioned, for the sum of $9,655, payable at the rate of $80 per month. (8) Finally, on February 18, 1959, he conveyed the gas station lot to the Showalters "subject to the life estate of the grantor therein."

Gatrel died testate on December 1, 1965, at the age of 80 years, and it appears that the last six months of his life had been spent in a hospital and a rest home. By his will, dated April 27, 1963, he disposed of his estate to persons other than the remaindermen named in his wife's will and with its admission to probate the seeds for the present controversy were sown. Insofar as pertinent here, the inventory filed in his estate reflected personal property totalling approximately $14,200 as follows: (1) The sum of $1,397.29, being the principal balance due on the contract for the sale of the Henry County property; (2) a savings account of $12,391.75; and (3) a checking account of $400.24. His real property consisted of his home which he and his wife had owned as joint tenants at the time of her death. Having significance in light of later argument of the remaindermen, bank records show that there was but $7.43 in the savings account on the date of Effie's death; that there was roughly $2,195 in it on November 20, 1944, when the duplex was sold; and $2,472 on February 18, 1959, when the gas station lot was conveyed. What the account balances were on September 26, 1951, when he entered into the contract to sell the gas station, and on November 24, 1949, when he sold the east 50 feet of the station lot, does not appear.

On July 21, 1966, the remaindermen named in Effie's will, hereinafter referred to as petitioners, filed a plead-

ing in Gatrel's estate which was apparently intended to be a petition under section 187a of the Probate Act (Ill Rev Stats 1965, c 3, paragraph 187a), to recover personal property in the hands of Gatrel's executor allegedly belonging to the petitioners. In substance, the issues and theories advanced by the petition were: (a) That there was no need, and thus no authority, for the life tenant either to resort to sale or to consume the proceeds thereof, and that his executor is therefore accountable, and his estate liable, for the total proceeds of the sales; or (b) that the $14,200 cash in Gatrel's estate was in fact unused and unconsumed proceeds of the sales which were impressed with a trust for the benefit of petitioners as the remaindermen under Effie's will. After the pleadings had been settled and after a hearing at which evidence was received, the Circuit Court of Rock Island County, treating the petition as one addressed to its general equity jurisdiction, resolved the issues for the respondent-executor, its order finding that there was no obligation upon the executor to account and that there was no property in Gatrel's estate to which petitioners had right or claim. The petitioners have appealed, asserting that the trial court erred in refusing to order an account, and that the $14,200 should have been found to be impressed with a trust for their benefit.

■■■■■ In the brief filed in this court petitioners have abandoned their claim that the proceeds of the sales must be accounted for because Gatrel lacked authority to sell and, instead, now seek to base the accounting and their purported right to Gatrel's entire estate upon a theory of trust, by extracting random trust principles from factually inapplicable decisions. Additionally, for the first time in their reply brief, petitioners seek to ground their right to relief on the theory that Effie's will, while giving her husband the power of sale, did not give him authority to use or consume the proceeds of sale. (See: Barton v. Barton, 283 Ill 338, 119 NE 320; Frank v. Frank, 305 Ill

181, 137 NE 151.) Although we are constrained to remark that we see little merit to either theory, particularly in view of the intent expressed in Effie's will, it is sufficient to point out that they are not properly before us. It is well settled that a party cannot try a case on one theory in the trial court and on another theory in a court of review (Blanchard v. Lewis, 414 Ill 515, 521, 112 NE2d 167; Chicago Title & Trust Co. v. DeLasaux, 336 Ill 522, 529, 168 NE 640). Furthermore, we will not consider contentions made for the first time in a reply brief (Maca v. Rock Island-Moline City Lines, Inc., 47 Ill App2d 31, 197 NE2d 463; Posner v. Firemen's Ins. Co., 49 Ill App2d 209, 199 NE2d 44).

This leaves for our consideration the contention of petitioners that the $14,200 in Gatrel's estate represents unused and unconsumed proceeds from the sales of the corpus of the life estate to which they are entitled under the terms of Effie's will. While it may be agreed there are firm precedents upon which petitioners may base their claim to unconsumed proceeds (e. g., Bevans v. Murray, 251 Ill 603, 96 NE 546; Hollerich v. Gronbach, 342 Ill App 242, 96 NE2d 354), the issue before us is whether the proof is such that it may be concluded, or reasonably inferred, that the money in Gatrel's estate is in fact, wholly or partially, unconsumed and unused proceeds of the sales.

Petitioners point to the circumstance that Gatrel's savings account contained only $7.43 on the date of his wife's death and, on such basis, insist that the money inventoried in his estate necessarily came "directly from his wife's estate" and is therefore "the property of the petitioners." There are, however, several basic fallacies and omissions in this argument, not the least of which is its apparent assumptions that Gatrel had no income of his own and that he was obligated to exhaust his own income and assets before using the proceeds from the sale of the trust corpus.

■ Effie's will contains no direction, express or implied, that her husband had to exhaust his own assets before he could invade the corpus of the life estate (c. f. Hart v. Connors, 85 Ill App2d 50, 228 NE2d 273), but gave to him "full power and authority to sell and dispose of any part thereof, whenever in his sound discretion he shall deem it necessary for his comfort and support." Quite obviously it was her primary purpose to provide for the comfort and support of her husband, and her intent that he should determine the amounts of corpus that would be required for his comfort and maintenance. He alone was to determine the need for sale and consumption and, except for the element of good faith, his judgment was not subject to the control of, or review by, the courts or questioned by the remaindermen (Rock Island Bank & Trust Co. v. Rhoads, 353 Ill 131, 141, 187 NE 139; 96 CJS, Wills, § 1067, p 712). Where the power to invade the corpus for maintenance and support creates an absolute charge on the corpus, and we think an absolute charge was intended by the testator here, it is held that the donee of the power is entitled to look solely to the corpus for maintenance and support, notwithstanding that such donee may have income and assets of his own. (In re: Walsh's Will, 85 NYS2d 207; In re: Smith's Will, 170 Misc 556, 11 NYS2d 945; In re: Workman's Estate, 231 Iowa 1351, 4 NW2d 373; Attebery v. Prentice, 158 Neb 795, 65 NW2d 138.) Stated in another way, a life tenant whom the testator intends to have an absolute power to sell and consume, is under no obligation to deplete his own assets or income before exercising his power.

■ Analyzing the record of the present case in light of the foregoing principles and Effie's expressed intent, it appears that Gatrel sold the corpus for $24,500 by three sales spread over a fifteen-year period starting shortly after his wife's death, the fifteenth year ending on March 18, 1959, when the contract for the sale of the gas

station property was apparently paid up and a deed delivered. Of the total received, the sum of $5,231.64 was used to retire the mortgage on the gas station, so that the actual amount he received for the sales of the corpus was $19,268.36. Averaged over the fifteen-year period between the first sale and the completion for the contract for the sale of the gas station, this comes to about $1,285 per year. During each of those fifteen years, as the trial court aptly pointed out, Gatrel not only had the expense of his own cost of living, but had the burden of paying taxes and maintenance on the gas station as well. And while the record does not show the total of such expenses, it is reasonable to infer that they were in excess of $1,285 per year and that none of the proceeds of sale were left unused or unconsumed. Turning to the savings account, the bank records show that the bulk of it was amassed between January 1, 1959, on which date it was $2,192.89, and Gatrel's death in December, 1965, when it totalled $12,391.75. This represents an increase of $10,198.86 over the last six years of his life, and an average monthly deposit of about $141. Significantly, during the same six-year period Gatrel had a monthly income of $80.90 from his railroad pension, and was receiving $80 per month from the sale of his Henry County property, the total of which exceeded his average monthly deposits, and could alone account for the accumulation existing at the time of his death. We concur with the trial court that the evidence fails to show that the cash in Gatrel's estate was, in whole or in part, unused or unconsumed proceeds of sale.

Nor, in our opinion, does petitioners' proof permit a finding that Gatrel lacked good faith, or that he exercised his power of sale and consumption solely to deprive the remaindermen of their interest, so as to put his executor to the burden of accounting for the sums he realized. (See: Lord v. Roberts, 84 NH 517, 153 A 1; 19

ILP, Fraud, § 41.) There is no showing that he diverted the sales proceeds to purposes other than his comfort and support, and neither is there proof that he increased his style of living. (See: 96 CJS, Wills, § 1067, p 710.) In light of his age, his meager pension income and the probability that he would never again be gainfully employed, most certainly Gatrel could derive comfort in the fact that the sale of the properties would permit him to retain and save his own modest income for use in the event of emergency brought about by economic change, illness or death. All of his transactions, we believe, were consistent with the dominant intent of Effie's will to give him the power and means to secure comfort and support out of her estate.

The judgment of the Circuit Court of Rock Island County was correct, and is therefore affirmed.

Judgment affirmed.

ALLOY, P. J. and STOUDER, J., concur.